## SINCLAIR et al. v. UNITED STATES.

No. 748.   Argued April 22, 23, 1929.—Decided June 3, 1929.

*Messrs. Martin W. Littleton* and *George P. Hoover* for Sinclair.

*Messrs. Daniel Thew Wright* and *Philip Ershler* for Day.

*Mr. Charles A. Douglas,* with whom *Messrs. Jo V. Morgan* and *Frederick C. Bryan* were on the brief, for William J. Burns and W. Sherman Burns.

*Mr. Owen J. Roberts* for the United States.

MR. JUSTICE McREYNOLDS delivered the opinion of the Court.

November 22, 1927, the United States, by their attorney, presented to the Supreme Court, District of Columbia, a written petition for an order requiring appellants Harry F. Sinclair, William J. Burns, W. Sherman Burns, and Henry Mason Day to show cause why they should not be punished for contempt of that court.

This petition alleged:—

That on October 17th, 1927, *United States* v. *Harry F. Sinclair and Albert B. Fall,* wherein the defendants were charged with conspiracy to defraud, came on for trial. Twelve persons selected as jurors were sworn at 12:20 P. M., October 18th, and thereafter the United States proceeded to present evidence. The jury was respited from day to day, until November 2nd when it was discharged and a mistrial entered because of charges of improper conduct by a juror, and proof showing that "there were a large number of operatives of the William J. Burns International Detective Agency of New York, then engaged in the District of Columbia, since October 18th, 1927, in a close, intimate, objectionable, and improper surveillance and investigation of the jurors aforesaid and the relatives, neighbors, and friends of said jurors."

That immediately after the jury was sworn Sinclair directed Day to engage the William J. Burns International Detective Agency, to receive reports therefrom and supervise the activities of its operatives for the following objects: "To spy upon said jurors and each of them, to bribe, intimidate and influence said jurors and each of them, and to do anything calculated to interfere with and impede said jurors and each of them in the unbiased discharge of their duties in the trial of said cause, and to influence pervert, impede, and prevent said jurors in the discharge of their duties as jurors, and to impede, pervert, and prevent the due administration of justice in said court in the trial of said criminal prosecution, either by corruptly influencing said jurors to decide the issues of said prosecution in favor of the defendants therein, or to disagree as to said issues, by unlawfully spying upon the said jurors and each of them for the purpose of concocting false charges against one or more of the said jurors, in case such a course should seem advantageous to said defendants in said cause, with a view of bringing about a mistrial of the cause aforesaid; or otherwise accomplish such purpose."

That Day employed the Agency through W. Sherman Burns, an officer then in New York; on the following day fifteen named operatives were assembled in Washington and assigned to spy upon, investigate, and shadow jurors. They continued so to do until November 2nd.

That William J. Burns then actively engaged in conducting the affairs of the Detective Agency visited Washington October 12 and 13th and arranged for the intended operations. November 3rd he returned and in pursuance of the general plan, procured a false affidavit concerning the conduct of Juror Glasscock which was presented to the trial Judge.

That operatives and employees of the Detective Agency investigated encumbrances on the home of one juror,

also the affairs of his neighbors; made an investigation of the brother and father of another juror; and one of them [McMullin] falsely reported that Juror Glasscock was seen in conference with an attorney for the United States.

That the operatives reported daily to their superior officer who disclosed the result to Day and Sinclair, the original reports being sent to W. Sherman Burns, New York City.

" That, at all times hereinbefore mentioned, each of the persons above named as respondents to this petition well knew all the premises aforesaid, and well knew that said criminal prosecution was being conducted in said court as aforesaid, that said prosecution was not finished, that said jurors were sworn jurors trying the issues in said cause in said court as aforesaid; that they the said respondents were not, as in fact they were not, called upon or authorized by said court, or by anybody in authority, to spy upon said jurors or any of them, or to bribe, molest, intimidate, or influence said jurors or any of them, or to do anything calculated to interfere with or impede said jurors of [or] any of them in the unbiased discharge of their said duties, or to influence, pervert, prevent, or in any manner, or to any extent, impede, the due administration of justice in said court in the trial of said criminal prosecution, either by corruptly influencing said jurors to decide the issues of said prosecution in favor of the defendants therein, or to disagree as to said issues, by unlawfully spying upon said jurors or any of them for the purpose of concocting false charges against one or more of said jurors, in case such a course should seem advantageous to said defendants in said cause, with a view of bringing about a mistrial of the cause aforesaid."

The rule issued. Appellants presented separate answers under oath.

They challenged the sufficiency of the petition to charge anything done in the presence of the court or near thereto

which obstructed or impeded due administration of justice, or tended so to do. They denied any purpose to establish "contact" between an operative and a juror, or that there was such contact; also any purpose to exert improper influence. They asserted the legal right under the circumstances to shadow jurors without contact; admitted employment of detectives who diligently followed the jurors while without the court room and made daily reports in respect of them.

The answer of William J. Burns stated that since August, 1921, he had not actively directed the affairs of the Detective Agency and was not aware until October 31st, 1927, when advised by a newspaper correspondent, that it had been employed to shadow the jury. He admitted presence in Washington October 12th and 13th, 1927, but denied that his visit had any connection with employment by Sinclair or his representatives. He also denied improper connection with the false affidavit concerning juror Glasscock by William J. McMullin, alias Long, also any association, directly or indirectly, with that operative until after the mistrial. And further: "This respondent says that had his advice been sought upon the subject he would unhesitatingly have advised that such employment was a lawful and proper practice frequently followed by the Bureau of Investigation of the Department of Justice of the United States on behalf of the Government, as well as by private litigants, both plaintiffs and defendants, in instances where juries are not kept together during the trial of a cause."

The answer of W. Sherman Burns admitted that he was secretary and treasurer of the Detective Agency and with his brother directed its operation; that on October 18th he accepted employment from Day to watch individual members of the jury and to report whether any person sought or established contact with them, but he averred that all operatives obeyed their strict instruction to do

nothing calculated to interfere with or intimidate any juror. He denied that he procured the making of any false affidavit or was guilty of improper conduct. And further: " If by the statement in said petition that ' they, the said respondents, were not, as in fact they were not, called upon or authorized by said court or by anybody in authority ' to spy upon the said jurors or any of them, it is meant to charge or to imply that the right to exercise surveillance of a jury empanelled in any cause is a right reserved exclusively to, and one that can be exercised only by, the government of the United States or its prosecuting officers, this respondent is advised by counsel that there is no warrant in law therefor, and this respondent is further advised by counsel that the Agency and its officers and operatives were strictly within, the letter and spirit of the law in accepting the employment hereinbefore described and defined, and in doing the work thereunder, and that no contempt of this honorable court was committed thereby."

The answer of Harry F. Sinclair admitted that he authorized the employment through Day of operatives of the Detective Agency for the purpose of shadowing the members of the jury without establishing contact, and that some fifteen operatives were assembled in Washington on October 19th who for a number of days thereafter kept the jurors under surveillance and made daily reports. He averred that he had cause to believe he had been under surveillance by representatives of the United States and feared efforts would be made unlawfully to influence the jury. Also that in the circumstances he rightly put the jury under observation. And further: " Having in mind the matters and things herein set forth, and believing that in cases involving great public interest the government from time to time had kept jurors under surveillance during the time of such trials, and, entertaining such belief that the government of the United States had exercised

such right and privilege, he believed that he, as a citizen of the United States, had the same right and privilege."

The answer of Henry Mason Day admitted that by direction of Sinclair he engaged the services of the Detective Agency, supervised their activities, received their reports and forwarded the same to Sinclair as deemed expedient. He alleged that he had reason to believe an attempt would be made unlawfully to influence the jury and that he had the right to cause the operatives to observe the jurors with the view of detecting any unlawful interference. He admitted that detectives were assembled in Washington and assigned to shadow the jurors and make reports; but he expressly denied any purpose improperly to influence or permit any operatives to establish contacts with them. He further said: "As the representative, friend and business associate of Harry F. Sinclair, this respondent, after consultation with him and instructions from him, did take part in the employment of the said Burns International Detective Agency, as he had a right to do, and this respondent did, as he had a right to do, give instructions to representatives of the said Burns International Detective Agency who were in charge of its operatives, to observe as far as they lawfully could, what persons, if any, came in contact with the said jurors during the recesses of Court, and detect, so far as it was lawfully possible so to do, whether any person or persons, endeavored or undertook improperly and unlawfully to approach and communicate with any of said jurors for the purpose of improperly influencing them in the decision of the said cause."

It is not questioned that counsel for the United States presented evidence to the court showing the activities of Burns detectives in shadowing jurors, also the misconduct of one of the jurors, and that by reason of these things a mistrial was entered on November 2d in *United States* v. *Sinclair & Fall.*

Trial upon the charge of contempt under the petition and answers above summarized commenced December 5th, 1927, and terminated February 21st, 1928. Much evidence was taken in open court—the condensation for the record occupies more than 750 printed pages. The appellants, except Sinclair, testified; also the fourteen operatives who shadowed the jurymen. Their daily reports were presented—more than 200 of them. These showed the details of the shadowing of each juror—except Flora, described in the sketch of him as a " bull-headed man." More than a hundred witnesses were called. During the hearing on question of guilt counsel made proffer of many witnesses to come from all parts of the United States for the purpose of showing that for a long time United States attorneys throughout the Union, under direction of the Department of Justice, by agents of the Department as distinguished from local marshals, had indulged in the custom of shadowing jurors, also to show indulgence in such practices on different occasions. This proffer was rejected.

Charged with conspiracy to defraud, Sinclair and Fall were put on trial October 17th, in the Supreme Court, District of Columbia. The jury—ten men and two women—was selected and finally sworn about mid-day October 18th. The Court made no order to lock them up. There was no request therefor. Immediately thereafter (about 3:30 o'clock) Sinclair gave biographical sketches of the jurors, secured by counsel before the trial began, to Day and instructed him to employ the William J. Burns International Detective Agency to supply a corps of operatives who should shadow them. On the 19th some fifteen operatives, including a manager, field men, etc., were assembled in Washington. One of them was assigned to each juror, except Flora, with instructions to go to the court room, identify and thereafter to keep his subject under as strict surveillance as possible " outside of the court " and report to the manager.

Day delivered the biographical sketches to Manager Ruddy. The latter testified: "At the first meeting with Mr. Day he told me that he wished daily reports made from each operative. We did. that. I designated the jurors to the operatives by numbers that I obtained from the list given me by Mr. Day. As I understand it was the position they sat in in the jury box, and they counted from left to right. I was never in the court room. I had a newspaper photograph of the jurors. I told the operatives which of the jurors they were to follow. I did not show them the picture at that time. I got it later. It was not given me by Mr. Day. I instructed each one of the agents to come down to the court room to pick up his particular juror. When the jurors left the court room, the operatives were instructed to hold them under surveillance until they went home, and up to a reasonable hour at night. All the operatives reported to me each day."

For some days these instructions were carried out. Jurors were kept under strict surveillance from early morning until late at night—11, 12, 3 o'clock, whenever not actually within the court house; daily reports were turned in and their contents conveyed to Day. On October 24th a majority of the operatives were sent away and the remainder concentrated their efforts upon three jurors whose history did not indicate strength of character. Investigation was made concerning encumbrances upon the home of one of these; also to determine whether another had indicated his views during the trial. A report by Operative McMullin October 22, 1927, purposely and falsely stated that the third (Glasscock) had consulted a representative of the United States.

The evidence does not disclose that any operative was instructed to approach, or did approach a juror, nor does it disclose that any juror actually knew that he was being

shadowed. Some were suspicious. The court did not know, nor does it appear that Sinclair's counsel knew, the jury was being shadowed.

Called as a witness, Day gave rather full account of himself from his youth up, including his army service. He was not permitted to say that he had knowledge of a practice by United States Attorneys to shadow juries in criminal cases after they were sworn.

He testified: The first conversation I had with Sinclair upon the subject of shadowing the jury was about 3 P. M. on October 18, 1927, " after Mr. Sinclair had come back from court. . . . We were at the Mayflower Hotel in Suite 1031, and Mr. Sinclair stated that he was terribly disappointed that the jury had not been locked up, and that he was very much exercised, that some of his enemies, competitors, and those who had written us so many malicious letters might in some way try to influence this jury, and stated he wanted me to tell one of the secretaries to call up Jeffries in New York and ask him to have one of the Burnses communicate with me at a place which would be convenient for me, and that he wanted from 12 to 14 operatives, with a lieutenant and a captain, sent to Washington to cover those who were sworn as jurors in this case. He said they were to cover these jurors, not to approach them, not to speak to them, not to in any way come in contact with them. They were simply to observe and report any suspicious acts which in their opinion might be done by the respective jurors, or those coming in contact with them, and to report also, if it was feasible, the people who did come in contact with them in a way which the operatives could do without arousing suspicion. That is the substance of the instructions."

Sinclair did not take the stand. The operatives severally testified that they were instructed in harmony with Sinclair's directions to Day and acted accordingly.

On November 2nd and 3rd William J. Burns was in Washington apparently with the purpose of doing something to off-set criticism of the Detective Agency aroused by the disclosures concerning surveillance of the jury. He consulted with Operative McMullin and procured the making of an affidavit by the latter based upon the false report of October 22, 1927, concerning Juror Glasscock and caused it to be presented to the presiding judge. A few days later he spoke of efforts by parties representing the United States to tamper with the jury and the affidavit of McMullin to that effect.

The trial judge held the petition stated a case upon which appellants might be adjudged guilty of contempt and the evidence showed their guilt. Among other things, he said: "I cannot escape the conviction, therefore, that respondent Sinclair, respondent Day, respondent Sherman Burns and respondent W. J. Burns, have been, perhaps in different degrees, all involved, more or less directly involved, in the establishment of this surveillance, a surveillance which I have already announced in my opinion constituted an obstruction to the administration of justice by this court. If it had not been for that surveillance, from aught that appears in this testimony, there never would have been a mistrial in this case, a surveillance that at least in part, together with the publication of the affidavit regarding it, but at least in part, necessitated a mistrial."

After close of the evidence and arguments and after the court had declared appellants were guilty of contempt counsel announced that upon the question of mitigation they re-offered the evidence tendered but excluded during the main case as to the custom of the Department of Justice to place juries under surveillance. This was overruled. Before sentence each appellant was called upon to make such statement as he might desire.

W. Sherman Burns was sentenced to pay a fine of One Thousand Dollars ($1000); Sinclair to imprisonment for six months; Day for four months; and William J. Burns for fifteen days.

Appeal was taken to the Court of Appeals. That court certified certain questions here for instructions. Thereafter, we directed the entire record to be sent up for our consideration.

Both Sinclair and William J. Burns were in Washington on October 12th and 13th, 1927, but there is no evidence of communication between them at that time. Sinclair had been a client of the Burns Agency. Circumstances connected with the making and filing of the false affidavit by McMullin, alias Long, based upon his false report of October 22nd concerning Juror Glasscock, and its presentation to the court on November 4th, also certain statements then or thereafter made by him, might reasonably cause one to suspect William J. Burns was party to the plan for surveillance. But he emphatically denied this and we can find no material evidence to support the charge against him. As to him, the judgment below must be reversed.

The Act of Congress approved March 2, 1831, 4 Stat. Chap. 99, p. 487, provides—

"*Be it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled,* That the power of the several courts of the United States to issue attachments and inflict summary punishments for contempts of court, shall not be construed to extend to any cases except the misbehavior of any person or persons in the presence of the said courts, or so near thereto as to obstruct the administration of justice, the misbehavior of any of the officers of the said courts in their official transactions, and the disobedience or resistance by any officer of the said courts, party, juror, wit-

ness, or any other person or persons, to any lawful writ, process, order, rule, decree, or command of the said courts."

Section 2 is in the margin.*

Section 1, of that Act, became R. S. § 725; Judicial Code § 268; U. S. Code, Title 28, § 385. The substance of § 2 appears in §§ 5399 and 5404, R. S.; Federal Criminal Code § 135; U. S. Code, Title 18, § 241. See *Ex parte Terry*, 128 U. S. 289; *Savin, Petitioner*, 131 U. S. 267.

Counsel maintain that the petition does not adequately charge and the record fails to show misbehavior by appellants which obstructed the administration of justice within § 268, Judicial Code, since there is neither averment nor evidence that any operative actually approached or communicated with a juror, or attempted so to do, or that any juror was conscious of observation. The insistence is that to establish misbehavior within that section it was essential to show some act both known by a juror and probably sufficient to influence his mind. We cannot accept this view. It would destroy the power of courts adequately to protect themselves—to enforce their right of self-preservation. Suppose, for example, some litigant should endeavor to shoot a juror while sitting in the box during progress of the cause. He might escape punishment for contempt if some quick-witted attendant quietly thwarted

---

* "SEC. 2. *And be it further enacted*, That if any person or persons shall, corruptly, or by threats or force, endeavor to influence, intimidate, or impede any juror, witness, or officer, in any court of the United States, in the discharge of his duty, or shall, corruptly, or by threats or force, obstruct, or impede, or endeavor to obstruct or impede, the due administration of justice therein, every person or persons, so offending, shall be liable to prosecution therefor, by indictment, and shall, on conviction thereof, be punished, by fine not exceeding five hundred dollars, or by imprisonment, not exceeding three months, or both, according to the nature and aggravation of the offence."

the effort and kept the circumstances secret until the trial ended.

*Toledo Newspaper Company* v. *United States,* 247 U. S. 402, 418, 421, adjudged the Company guilty of contempt by publishing, in the city where the court was sitting, articles concerning a pending equity case. Counsel there maintained that it was not alleged, proved, or found that any of the publications was brought into the court building or read by the judge and, therefore, he lacked power to punish under § 268, Judicial Code. Also that publication of newspaper articles outside the court room was not misbehavior amounting to contempt unless actually known to the judge. Replying, this Court, through Mr. Chief Justice White, said:—

" Clarified by the matters expounded and the ruling made in the Marshall Case [*Marshall* v. *Gordon,* 243 U. S. 521], there can be no doubt that the provision [§ 268] conferred no power not already granted and imposed no limitations not already existing. . . . The provision therefore, conformably to the whole history of the country, not minimizing the constitutional limitations nor restricting or qualifying the powers granted, by necessary implication recognized and sanctioned the existence of the right of self-preservation, that is, the power to restrain acts tending to obstruct and prevent the untrammeled and unprejudiced exercise of the judical power given by summarily treating such acts as a contempt and punishing accordingly. The test, therefore, is the character of the act done and its direct tendency to prevent and obstruct the discharge of judicial duty,—a conclusion which necessarily sustains the view of the statute taken by the courts below. . . .

" True, it is urged that, although the matters which were made the basis of the findings were published at the place where the proceedings were pending and under the cir-

cumstances which we have stated, in a daily paper having large circulation, as it was not shown that they had been seen by the presiding judge or had been circulated in the court room, they did and could form no basis for an inference of guilt. But the situation is controlled by the reasonable tendencies of the acts done and not by extreme and substantially impossible assumptions on the subject. Again, it is said there is no proof that the mind of the judge was influenced or his purpose to do his duty obstructed or restrained by the publications and, therefore, there was no proof tending to show the wrong complained of. But here again not the influence upon the mind of the particular judge is the criterion but the reasonable tendency of the acts done to influence or bring about the baleful result is the test. In other words, having regard to the powers conferred, to the protection of society, to the honest and fair administration of justice and to the evil to come from its obstruction, the wrong depends upon the tendency of the acts to accomplish this result without reference to the consideration of how far they may have been without influence in a particular case. The wrongdoer may not be heard to try the power of the judge to resist acts of obstruction and wrongdoing by him committed as a prelude to trial and punishment for his wrongful acts."

Under the doctrine so stated, we think the trial judge rightly held it unnecessary to allege or show actual contact between an operative of the Detective Agency and a juror, or that any juror had knowledge of being observed. The reasonable tendency of the acts done is the proper criterion. Neither actual effect produced upon the juror's mind nor his consciousness of extraneous influence was an essential element of the offense.

That the acts here disclosed, and for which three of the appellants were certainly responsible, tended to obstruct the honest and fair administration of justice we cannot

doubt. The jury is an essential instrumentality—an appendage—of the court, the body ordained to pass upon guilt or innocence. Exercise of calm and informed judgment by its members is essential to proper enforcement of law. The most exemplary resent having their footsteps dogged by private detectives. All know that men who accept such employment commonly lack fine scruples, often wilfully misrepresent innocent conduct and manufacture charges. The mere suspicion that he, his family, and friends are being subjected to surveillance by such persons is enough to destroy the equilibrium of the average juror and render impossible the exercise of calm judgment upon patient consideration. If those fit for juries understand that they may be freely subjected to treatment like that here disclosed, they will either shun the burdens of the service or perform it with disquiet and disgust. Trial by capable juries, in important cases, probably would become an impossibility. The mistrial of November 2nd indicates what would often happen. We can discover no reason for emasculating the power of courts to protect themselves against this odious thing. See *United States* v. *Shipp*, 203 U. S. 563, 575.

The acts complained of were sufficiently near the court. Most of them were within the court room, near the door of the court house, or within the city. Certainly, they were not more remote than the publication denounced in *Toledo Newspaper Company* v. *United States*. There was probable interference with an appendage of the court while in actual operation; the inevitable tendency was towards evil, the destruction, indeed, of trial by jury. *In re Savin, Petitioner, supra.*

During the hearing and before conviction of guilt counsel proffered many witnesses by whom they proposed to show a practice of the Department of Justice to cause its officers to shadow jurors. This evidence was rightly excluded. That Department is not a lawmaker and mis-

takes or violations of law by it give no license for wrongful conduct by others.

After the judge had declared the appellants guilty, counsel offered in mitigation of punishment the same evidence concerning the alleged custom of the Department of Justice theretofore tendered on the issue of guilt. The tender was refused. Very many witnesses, who it was said would testify to such custom, had been proffered and the proposed evidence rejected; all were again tendered. The offer did not limit the proposal to the appellants' knowledge or belief or mental state. They had answered under oath, with full opportunity to present whatever they deemed important. Before sentence each was accorded opportunity to make a statement. There was no request for permission to file affidavits. Counsel were fully heard. In the circumstances, the court did not exceed the limits of proper discretion.

*Cooke* v. *United States,* 267 U. S. 517, 537, 538, is relied upon. There, we declared: " Due process of law, therefore, in the prosecution of contempt, except of that committed in open court, requires that the accused should be advised of the charges and have a reasonable opportunity to meet them by way of defense or explanation. We think this includes the assistance of counsel, if requested, and the right to call witnesses to give testimony, relevant either to the issue of complete exculpation or in extenuation of the offense and in mitigation of the penalty to be imposed. . . . In cases like this, where the intention with which acts of contempt have been committed must necessarily and properly have an important bearing on the degree of guilt and the penalty which should be imposed, the court can not exclude evidence in mitigation."

By this language we did not intend to lay down any new or hard and fast rule concerning evidence to be heard in mitigation in proceedings for contempt; and certainly there was no purpose to restrict the discretion of the trial

judge in such cases more narrowly than in ordinary criminal trials. See Wharton's Criminal Procedure, 10th ed., § 1890. Moreover, the conscious purpose of Cooke was regarded as an essential element of the offense charged.

Always the language used in an opinion must be read in the light of the issues presented. Cooke was not accorded due opportunity at any stage of the proceedings to state the facts which might excuse or mitigate his conduct and the words quoted were addressed to that situation. Here there was abundant opportunity for presentation of anything really important.

Under the circumstances here disclosed to hear the many witnesses offered by counsel would have required unnecessary and intolerable extension of the long drawn out trial without material benefit. The answers relied or might have relied upon the knowledge possessed by appellants. By short affidavit or verbal statement any appellant could have advised the court again concerning facts within his knowledge, his beliefs, or general state of mind—matters which might possibly affect the degree of guilt.

The exclusion of some other evidence is assigned as error; but we think the claim is without merit and demands no extended comment.

Objections are offered to the admission of certain evidence. In answer, we need only refer to what was said in *The United States* v. *King,* 7 How. 833, 854, 855: "In some unimportant particulars, the evidence objected to was not admissible. But where the court decides the fact and the law without the intervention of a jury, the admission of illegal testimony, even if material, is not of itself a ground for reversing the judgment, nor is it properly the subject of a bill of exceptions. If evidence appears to have been improperly admitted, the appellate court will reject it, and proceed to decide the cause as if it was not in the record."

Considering the whole record, we think appellants had a patient hearing upon adequately defined issues, with abundant opportunity to put forward all proper defenses and explanations. With the exception already stated, there is ample evidence to support the judgment; the punishments imposed are not excessive; the court kept within the limits of its reasonable discretion and did nothing which injuriously affected the substantial rights of the parties. Judicial Code, § 269; U. S. Code, Title 28, § 391.

The judgment as to William J. Burns must be reversed; as to the other appellants it is affirmed.

MR. JUSTICE STONE took no part in the consideration or determination of this cause.