In the Matter of AARON L. SAPIRO (Also Known as AARON SAPIRO and AARON LELAND SAPIRO), an Attorney, Respondent.

First Department, June 18, 1941.

*S. C. Lewis* of counsel [*Einar Chrystie*, attorney], for the petitioner.

No appearance for the respondent.

MARTIN, P. J. In the fall of 1932, Murray C. Harwood and several other persons were indicted in the United States District Court for the Southern District of New York for the crime of using the United States mails to defraud. Harwood originally retained the respondent to act as his attorney. Because the respondent's business required his appearance in Chicago and other cities, it was arranged that Mr. Charles L. Kahn should represent the respondent and serve as attorney of record. Mr. Kahn was retained under an agreement which provided that the fee was to be fixed

by the respondent, who should retain half of it for acting as counsel and adviser. The trial of Harwood began on January 3, 1933, and continued until March 13, 1933, when Harwood was convicted and sentenced to four years in prison.

Several weeks after the trial of Harwood had been in progress, and at a time when the jury had been selected and was serving as such, the respondent induced a man named Samuel Roth to " investigate " the qualifications, residence and citizenship of the jurors then serving on the trial. Roth visited the homes of a number of jurors. He interviewed the brother of one and the wife of another. The testimony discloses that he tried to enlist the sympathy of the latter and attempted to bribe her. As a result of Roth's attempt to influence the jurors, the respondent's knowledge of such attempt and his failure to disclose his knowledge of Roth's conduct to the trial court, both the respondent and Roth were prosecuted in the United States District Court for the Southern District of New York for the crime of attempting to bribe jurors. Roth was convicted but the respondent was acquitted.

Thereafter, because of their failure to disclose to the trial court their knowledge of Roth's conduct, the respondent and Charles L. Kahn were subjected to disciplinary proceedings in the United States District Court for the Southern District of New York. Kahn was found not guilty but the respondent was found guilty and disbarred. An appeal resulted in a reversal so that appropriate findings might be made. A second order of disbarment was thereafter entered, which was affirmed on appeal (101 F. [2d] 1018).

Based upon the respondent's knowledge of Roth's activities and his failure to disclose them to the trial court, the petitioner instituted charges of professional misconduct against the respondent. The matter was referred to an official referee who has submitted his report finding the respondent guilty of misconduct as charged. The respondent has defaulted on this motion by the petitioner to confirm the referee's report.

The testimony in the United States court on the trial against Roth and the respondent on the criminal charges and in the disciplinary proceedings against Kahn and the respondent, as well as the testimony in the disciplinary proceedings before the official referee, discloses that the respondent approved a suggestion made by Harwood that the jurors be investigated and recommended to Kahn that Roth do the investigating. Thereafter Kahn gave to Roth a list of the names and addresses of the jurors in the case. Kahn testified that when he gave Roth the list he admonished him against " contacting " any juror or any member of a juror's family.

Roth, however, testified that Kahn told him to find out if the jurors lived at the addresses given, if they were working and how long a period of time had expired since they had last served on a jury. Roth actually spoke to a Mrs. Chauvin, whose husband was serving as a juror in the case, and he also spoke to a brother of a juror named Magrino.

Mrs. Chauvin testified in the criminal proceedings against the respondent and Roth in the United States District Court. She there stated that Roth visited her on two occasions. The first was in the middle of February, 1933. Roth then asked Mrs. Chauvin if her husband was working. In reply Mrs. Chauvin asked Roth if he had a job for her husband and he answered " Maybe." Concerning Roth's second visit made about ten days later, Mrs. Chauvin testified: " A. * * * He also told me that this young man was married, recently married and that if he was found guilty his wife perhaps would kill herself. So I did not tell him I would talk to my husband about it, but he had my sympathy, rather, he got on my sympathy, rather. Q. Yes? Did he say anything about the condition of this man's wife? A. Yes, he said she was pregnant, going to have a baby. Q. Going to have a baby? A. Yes, sir, and this Mr. Harwood was coming from a fine family; if he was acquitted his family would come up to see me, and I said I did not want anybody to come to see me. Then he began talking about fares to Europe. And he asked me if I liked to go home. I said, ' No, thank you.' I said, ' Are you trying to bribe me? ' He said, ' God forbid he would bribe me.' I think I told you the most important things."

Roth admitted making the first visit testified to by Mrs. Chauvin, but denied the second visit and said he never sought to bribe her. The respondent admitted that Roth had stated he had met Magrino's brother and the wife of Chauvin but denied he had ever been told by Roth about a second visit to Mrs. Chauvin.

The testimony discloses, however, that Roth and the respondent were close friends and that largely through respondent's efforts Roth had received several responsible positions, one being that of a corporation president at a salary of $15,000 a year, and another that of assistant vice-president of a bank of which respondent was chairman of the board of directors. Furthermore, the evidence is uncontradicted that Roth was acting as investigator in the Harwood case because he was a friend of the respondent. He received no salary for his services. There was also testimony that the respondent, because of his desire to aid Harwood on the criminal trial, had agreed to guarantee the members of Harwood's family against any loss if they would go on a bail bond for Harwood. In

addition, on two occasions he had sent Roth, and on another occasion he had sent Mrs. Harwood, to Philadelphia to intercede with Harwood's family to assist Harwood. The expenses of Mrs. Harwood's trip were paid by the respondent. The close relationship between Roth and the respondent and the evident desire of the respondent to secure the acquittal of Harwood lead to the conclusion that all activities by Roth in " contacting " members of the jury in the Harwood case were known to and approved by respondent.

In any event, while Roth was engaged in his activities, Mr. Chauvin reported to the court that an effort had been made to get in touch with him. The trial court, in the presence of Kahn, cautioned the entire jury against any attempt to communicate with them. These facts were made known to the respondent but he did not disclose to the trial court that he knew Roth had been investigating members of the jury and had, in fact, talked to the wife of one juror and the brother of another.

In his opinion disbarring the respondent in the Federal court, Judge KNOX wrote: " The situation in this case was much worse than that which was before the Supreme Court of the United States in *Sinclair* v. *United States*, 279 U. S. 749, and as I have heretofore said, ' should receive a harsher condemnation ' than was there administered. Here, Sapiro, by his own admission, was fully aware that Roth, upon behalf of Harwood, had talked with the wife of one juror and a brother of another. He failed, nevertheless, to inform the judge presiding at Harwood's trial that this had occurred. Notwithstanding his obligations as an officer of the Court, Sapiro was willing to have his client become the beneficiary of whatever advantages might accrue to him through Roth's unlawful activities. In other words, he was content that justice should be improperly influenced if not polluted, at its source. This, in my judgment, when one considers Sapiro's experience and intelligence, was a serious offense. But, there is an additional factor·to be taken into account. It is this: In his approaches to Mrs. Chauvin, Roth made statements that were intended, I have no doubt, to cause her to become aware that it would be to the advantage of herself and husband if he were to vote for Harwood's acquittal. To put the matter differently, bribery was suggested, if not actually offered. While the proof before me will not support a finding that Sapiro had previously authorized Roth to suggest that bribes were available to Jurors Chauvin and Magrino, I do believe that Roth reported to Sapiro the entire substance of what he had said to Magrino and to Mrs. Chauvin. Respondent was thus made aware of the attempt to corrupt one of the jurors who was sitting in judgment upon the acts of his client. And yet he

did nothing to avoid a possible miscarriage of justice. To my mind, this constituted nothing less than corrupt misconduct, and in the absence of any extenuating circumstances, merits disbarment. For an attorney knowingly to permit himself and client possibly to profit as a result of the attempted bribery of a juror, is about as culpable as was the offer of the bribe."

In his opinion sustaining the charge that the respondent was guilty of professional misconduct, the official referee said that the respondent " knew before the conclusion of the trial that Roth had entered upon such employment and had made improper contacts with or had interviewed relatives of at least two of the jurors and he failed to inform the trial court that such contacts had been made and conversations had.

" That although one of the jurors upon whose wife Roth had called reported that contact to the presiding judge on the trial, and although the presiding judge thereupon in open court cautioned the jurors against any attempt to communicate with them directly or indirectly, and although the respondent was informed of the presiding judge's remarks by Harwood's attorney of record, and knew that this juror's wife had been approached by Roth, he failed to disclose any information to the presiding judge of the contacts which he knew had been made with members of the jurors' families, thereby obstructing the administration of justice.

" In my opinion the evidence establishes conclusively that the respondent has been guilty of professional misconduct in arranging for the employment of one Roth for the purpose of investigating jurors in a case on trial in the United States District Court in which he, the respondent, was counsel, and in permitting the said Roth to make improper contacts with relatives of jurors and permitting him to make promises, suggestions and inducements to them calculated to induce them to influence the jurors in favor of his client, Harwood, and in failing to inform the trial court that such contacts and conversations had taken place."

In *Sinclair* v. *United States* (279 U. S. 749) the Supreme Court of the United States held that the systematic shadowing by a corps of private detectives on behalf of a defendant in a criminal case of the jurors throughout the progress of the trial, as well as investigations by such detectives concerning incumbrances on the home of one juror and efforts to determine whether another had indicated his views during the trial, although no juror was approached, communicated with or was conscious of observation, obstructed the administration of justice. In writing for the court, Mr. Justice McREYNOLDS said: " Counsel maintain that the petition does not adequately charge and the record fails to show misbehavior by appellants which

obstructed the administration of justice within § 268, Judicial Code, since there is neither averment nor evidence that any operative actually approached or communicated with a juror, or attempted so to do, or that any juror was conscious of observation. The insistence is that to establish misbehavior within that section it was essential to show some act both known by a juror and probably sufficient to influence his mind. We cannot accept this view. It would destroy the power of courts adequately to protect themselves — to enforce their right of self-preservation.

"* * * We think the trial judge rightly held it unnecessary to allege or show actual contact between an operative of the Detective Agency and a juror, or that any juror had knowledge of being observed. The reasonable tendency of the acts done is the proper criterion. Neither actual effect produced upon the juror's mind nor his consciousness of extraneous influence was an essential element of the offense.

" That the acts here disclosed, and for which three of the appellants were certainly responsible, tended to obstruct the honest and fair administration of justice we cannot doubt. The jury is an essential instrumentality — an appendage — of the court, the body ordained to pass upon guilt or innocence. Exercise of calm and informed judgment by its members is essential to proper enforcement of law. The most exemplary resent having their footsteps dogged by private detectives. All know that men who accept such employment commonly lack fine scruples, often wilfully misrepresent innocent conduct and manufacture charges. The mere suspicion that he, his family, and friends are being subjected to surveillance by such persons is enough to destroy the equilibrium of the average juror and render impossible the exercise of calm judgment upon patient consideration. If those fit for juries understand that they may be freely subjected to treatment like that here disclosed, they will either shun the burdens of the service or perform it with disquiet and disgust. Trial by capable juries, in important cases, probably would become an impossibility."

The evidence establishes that in the so-called " investigation " of the jurors, Roth not only carried his activities to the point where he sought to persuade relatives of jurors to influence the latter in favor of respondent's clients, but that he sought to bribe them. A jury in the United States District Court convicted Roth of attempting to bribe jurors. The respondent was responsible for Roth's so-called " investigation " of the jurors in the Harwood trial. Roth was a close friend of the respondent and rendered his services without any payment therefor. Respondent admitted that he knew Roth had talked to the relatives of two jurors. His failure

to report to the trial court the fact that the jury was being tampered with established his approval and ratification of Roth's activities. His acquiescence in the attempted bribing of jurors constituted professional misconduct and demonstrates his unfitness to remain a member of an honorable profession.

As a practicing member of the bar, the respondent must have known that the " investigation " he admittedly requested Roth to make was wholly unnecessary. It is evident that it was never intended that Roth should limit the investigation to a " check " on the addresses of the jurors. The respondent was determined to aid Harwood and to accomplish that end was willing to aid in or permit the influencing of jurors.

The respondent should be disbarred.

O'MALLEY, TOWNLEY, COHN and CALLAHAN, JJ., concur.

Respondent disbarred.