29290. SUMMERS *v.* THE STATE *ex rel.* BOYKIN,
solicitor-general.

DECIDED FEBRUARY 20, 1942.

*Ezra E. Phillips,* for plaintiff in error.

*John A. Boykin, solicitor-general, Daniel Duke, Durwood T. Pye,* contra.

MACINTYRE, J.   W. W. Scarborough was indicted in the Fulton superior court for "flogging"—assault and battery.   His case was assigned for trial on March 26, 1941.   Herbert Dodson was drawn to serve in the criminal division of the court as a juror for that week, and subsequently served as a juror during that time and was selected as a juror in the Scarborough case.   The defendant in this case, a mail carrier who carried mail to Mr. Dodson's home, was a nephew of Scarborough.   On March 21, prior to Dodson's service as a juror but after he had been drawn, knowing he had been so drawn to serve, the defendant went to Dodson's home and asked Mrs. Dodson, the prospective juror's wife, if he might see her husband.   Mrs. Dodson testified that Mr. Dodson was not at home and that the defendant stated to her that "He understood that he [Mr. Dodson] was   .   .   to serve on the jury the next week   .   .   and he said that his uncle, Mr. Scarborough, was to be tried, and he would like

to talk with him [Mr. Dodson]; that there was something that they were trying to bring up that he did not believe was true against his uncle. So he asked me if I knew just how things stood. I told him I did not. He meant by asking me just how things stood that if we had discussed the cases, you know, or how we felt about these people that were to be tried, and I told him I couldn't tell him. Mr. Summers said they were going to bring up some thing against his uncle that had happened several years back, that his uncle did not have anything to do with. . . . He [the defendant] asked just when he could see him [Mr. Dodson]. He told me he would be back Sunday. I told him we went to church on Sunday and would get home around twelve-thirty or one o'clock, and he just said, 'Tell him I will see him Sunday,' and I told him all right. My husband gets home around six o'clock in the evening and I related the conversation I had with Mr. Summers earlier in the day. . . . I just told him what Mr. Summers had said, just as soon as my husband came home." Mr. Dodson testified that his wife reported to him that the defendant had been there to see him, and related to him the conversation she had had with the defendant; that on the following Sunday they went to church and "After church, which is from eleven o'clock to twelve o'clock, we left and went back home and had lunch. I told my wife, I said, 'If Mr. Summers comes down here now, I am not going to be here; I am not going to be at home for I don't want to discuss the case with him or anybody else;' and we left and went and got in the automobile and went on down home, and whether Mr. Summers came to the house on Sunday afternoon or not I do not know because I was not there." Other evidence disclosed that the defendant did go to Dodson's home on the Sunday in question but was unable to see him because no one was at home. Mr. Dodson stated: "The reason I left home that Sunday evening was to keep him from seeing me." Under the foregoing evidence the defendant was adjudged to be in contempt of court. To the overruling of the defendant's demurrers to the information or application for a rule for contempt, to the overruling of the defendant's motion to dismiss and quash the rule, and to the order of the court adjudging the defendant guilty of contempt the defendant excepted.

The information or application for a rule for contempt was brought in the form of a petition by the solicitor-general and states:

"The petition of John A. Boykin, solicitor-general, of the Atlanta judicial circuit, respectfully shows to the court the following facts, to wit: 1. The petitioner, as solicitor-general, is charged with the duty of prosecuting all criminal cases which are indicted and retained for trial in the above-stated court and all acts of contempt which may be committed in or against this court." The petition then sets forth facts which the solicitor contended constituted the contempt. The petitioner then prayed "That this petition be inquired into; that witnesses be heard on oath as to the allegations set forth in this petition and that the said Glenn Summers be required by a proper order of this court to be and appear before this court at such time and place as may be fixed in said order, there to show cause why he should not be adjudged in contempt of this court." Upon a careful consideration of the demurrers to the petition and the motion to quash the petition and rule for contempt upon each and every ground therein set out, we do not think they are meritorious. The judge did not err in ruling as he did with reference thereto.

"Embracery is an attempt, whether successful or not, to influence a jury corruptly to one side, by promises, persuasions, entreaties, money, entertainments, and the like. Every embracer who shall procure, or attempt to procure, a juror to take money, gain, or profit, or shall corruptly influence, or attempt to influence, a juror, by persuasions, promises, entreaties, or by any other means, shall be punished by imprisonment and labor in the penitentiary for not less than one year nor more than four years." Code, § 26-4702. Oswald's Contempt of Court at page 90 says that embracery at common law "Consists in any attempt whatever to corrupt, or influence, or instruct a jury in the cause beforehand, or in any way to induce them to be more favorable to the one side than to the other, by money, promises, letters, threats, or persuasions, except only by the strength of evidence and the arguments of counsel in open court at the trial, whether the jury give a verdict or not, or whether the verdict given be true or false." Because "a given act may be indictable does not deprive a court of the power of dealing with it as a contempt of court." *Bradley* v. *State,* supra. Embracery constitutes a contempt of court, but to commit a contempt of court by attempting to improperly influence a juror designate (one who has been drawn as a juror) one does not necessarily have to be guilty

of embracery. In Brewer v. State, 176 Miss. 803 (170 So. 540) the court said: "The chief argument in behalf of appellant and for a reversal is upon the proposition sustained by some cases, in other jurisdictions, that an unsuccessful attempt to procure another to convey to a juror an offer of a bribe is not a contempt; that in order to constitute a contempt there must be a personal contact by the contemnor with the juror himself. And among others, In re Ellison, 256 Mo. 378, 165 S. W. 987, and U. S. v. Carroll (D. C.), 147 F. 947, are cited in support of this contention. We decline to follow this line of cases, but prefer that course which is disclosed in such cases as *Bradley* v. *State*, 111 *Ga.* 168 [supra], and Little v. State, 90 Ind. 338, 46 Am. R. 224, although we do not now commit ourselves to go quite so far as either of the two cases last cited. See also Sinclair v. U. S., 279 U. S. 749, 49 S. Ct. 471, 73 L. ed. 938, 63 A. L. R. 1258." Thereafter, the court in the Brewer case, supra, on page 541 states: "When there is a deliberate purpose or calculation to corrupt the administration of justice and that purpose or calculation is accompanied by a definite overt act or declaration on the part of the contemnor, designed to carry that purpose or calculation into effect, the contempt is complete; and the failure of the design becomes immaterial, except as it may have some place in considering the punishment to be inflicted." In *Griffin* v. *State*, 26 *Ga.* 493, 506, the court indicates that an "attempt" is to be considered any "endeavor, trial, undertaking [or] effort to gain a point;" and that an attempt to commit a crime is "an endeavor to accomplish it, but falling short of execution of the ultimate design."

Applying these rules to this case, the judge was authorized to find that even though the contemnor did not contact the juror himself, yet the declaration to the wife of the juror designate was an overt act; that, in the ordinary and likely course of things, the wife would repeat it to her husband, although the contemnor had not asked her to do so; that this was the natural and reasonable consequence of the act; and that he intended and expected that his declaration would, by the wife, be repeated to her husband, and that through her, as an innocent agent, the contemnor would accomplish the desired result of instructing the juror in the cause beforehand (not in open court), and inducing the juror to be more favorable to the defendant than to the State. Under the evidence

the judge was further authorized to find that the defendant made a second attempt to contact the juror in person by visiting his home the second time, and that the only thing that prevented him from so doing was the fact that the juror, believing that it would be improper for him to discuss the case with the contemnor, purposely stayed away from home in order to avoid this personal contact with the contemnor. Thus, the evidence authorized a finding that the defendant was guilty of contempt in that there was a deliberate purpose or calculation to improperly influence a juror designate (one who had been drawn as a juror), and that that purpose or calculation was accompanied by a definite act or declaration on the part of the contemnor in an effort to carry that purpose or calculation into effect. Thus, the contempt was complete, and the failure of the undertaking becomes immaterial except as to the punishment to be inflicted. *Richardson* v. *State,* 43 ·*Ga. App.* 229 (158 S. E. 369) ; Brewer *v.* State, supra; In Re Opinion of Justices, 301 Mass. 615 (17 N. E. 2d, 906) ; Gridley *v.* U. S., 44 Fed. 2d, 716, 744; Cardashian *v.* Snyder, 283 U. S. 827 (51 Sup. Ct. 351, 75 L. ed. 1441) ; Ex Parte Privitt, 127 Texas Cr. 475 (77 S. W. 2d, 663) ; Sinclair *v.* U. S., 279 U. S. 749 (49 Sup. Ct. 471) ; Emery *v.* State, 78 Neb. 547 (111 N. W. 374).

*Judgment affirmed. Broyles, C. J., and Gardner, J., concur.*