974 F.2d 1015
 36 Fed. R. Evid. Serv. 1096
 SOUTH CENTRAL PETROLEUM, INC.; Jerry R. Sawyer, Appellees,
v.
LONG BROTHERS OIL COMPANY; Charles L. Long; David B. Long;
Kenneth F. Long; Pat W. Long; Imogene Long, Appellants.
A. V. Beebe; Harold Wisenhunt.
 No. 91-3690.
 United States Court of Appeals,
Eighth Circuit.
 Submitted: June 8, 1992.
Decided Sept. 10, 1992.
 
 Robert C. Compton, El Dorado, Ark., argued (William I. Prewett, on the brief), for appellants.
 B. Michael Bennett, Dallas, Tex., argued, for appellees.
 Before JOHN R. GIBSON, Circuit Judge, HEANEY, Senior Circuit Judge, and BEAM, Circuit Judge.
 HEANEY, Senior Circuit Judge.
 
 
 1
 In this diversity action, Long Brothers Oil Company appeals the district court's grant of summary judgment and order that South Central Petroleum and Jerry Sawyer pay Long Brothers Oil Company $62,627 in exchange for one-half ownership of an oil well. We affirm.
 
 FACTS
 
 2
 In 1985, Long Brothers Oil Company (Long Brothers), along with several other investors, purchased Fouke (oil) Field in Miller County, Arkansas, from Phillips Petroleum Company (Phillips). As part of the transaction with Phillips, Long Brothers bought all but an 11.22 percent interest in a gas well known as the Silberberg B-1. Long Brothers did, however, acquire from Phillips a preferential right to purchase the unsold interest, which was owned by Texaco Producing, Inc. (Texaco); Long Brother's preferential purchase right enabled it to successfully match any offer made to Texaco for the 11.22 percent interest.
 
 
 3
 Long Brothers began "producing" Fouke Field in 1986. On September 27, 1988, Long Brothers signed an agreement with South Central Petroleum and Jerry Sawyer "to work together in an effort to buy Texaco's one-eighth ( 1/8) working interest in the Silberberg # B-1 unit." To pursue this goal, Long Brothers agreed to contact Texaco and attempt to acquire Texaco's Silberberg B-1 interest "for a price not to exceed $400,000." If Long Brothers succeeded and if the property was not quickly resold, the parties agreed to purchase and own the interest according to a 50 percent (Long Brother's purchase and ownership share), 37.5 percent (South Central Petroleum), and 12.5 percent (Sawyer) arrangement. The parties further agreed that their agreement would become effective September 15, 1988 and "continue in effect for a period of six (6) months, and thereafter until terminated by any of the parties to this agreement with thirty (30) days prior written notice."
 
 
 4
 On December 5, 1988, Texaco agreed to sell its Silberberg B-1 interest to a third party. On February 14, 1989, Long Brothers notified Sawyer that it was terminating their agreement pursuant to the thirty-day termination provision. Less than thirty days later, on March 15, 1989, Long Brothers exercised its preferential purchase right and purchased Texaco's interest in the Silberberg B-1 for $137,500. Long Brothers then divided its new acquisition among the partners who had originally organized to purchase Fouke Field. Long Brothers did not notify Sawyer or South Central Petroleum of the Texaco acquisition.
 
 
 5
 When Sawyer and South Central Petroleum learned of Long Brothers' acquisition of Texaco's interest on January 15, 1991, they demanded that Long Brothers convey one-half of the acquisition pursuant to the September 27, 1988 agreement. Long Brothers refused, and this action ensued.
 
 
 6
 Arguing that their contract with Long Brothers should be enforced, Sawyer and South Central Petroleum moved the district court for summary judgment. The district court granted their motion. After conducting a trial to determine a remedy, the district court ordered Long Brothers to transfer one-half of the acquired Texaco interest to Sawyer and South Central Petroleum, who in return were ordered to pay Long Brothers one-half of the purchase price and transaction costs ($90,928) minus an offset ($28,301), representing one-half of the income minus expenses earned by Long Brothers from the Texaco interest from the time Long Brothers acquired it until the district court's order. This offset resulted in a net payment of $62,627 by Sawyer and South Central Petroleum to Long Brothers in exchange for the transfer of one-half of the acquired Texaco interest.
 
 DISCUSSION
 I.
 
 7
 Long Brothers first appeals the district court's grant of summary judgment. According to Long Brothers, Sawyer and South Central Petroleum sat on their rights to own the Texaco property until such ownership appeared profitable, and thus, Sawyer and South Central Petroleum waived their right to enforce their agreement with Long Brothers.[1] See Sanders v. Flenniken, 180 Ark. 303, 21 S.W.2d 847, 848 (1929) (citing with approval Patterson v. Hewitt, 195 U.S. 309, 321, 25 S.Ct. 35, 38, 49 L.Ed. 214 (1904) ("There is no class of property more subject to sudden and violent fluctuations of value than mining lands[,] ... and there is no class of cases in which the doctrine of laches has been more relentlessly enforced.")).
 
 
 8
 Long Brothers, however, does not dispute that Sawyer and South Central did not discover Long Brothers' acquisition of the Texaco property until nearly two years after its purchase. In fact, with respect to this issue, Long Brothers limited its evidence to the affidavit of Charles Long, who claimed that if Long Brothers knew that Sawyer and South Central Petroleum would attempt to exercise their right, Long Brothers would have settled an independent foreclosure litigation differently, and in the process, would have resolved the current dispute. The district court characterized Long's opinion as "pure speculation." We agree with this characterization. See generally Resource Developers, Inc. v. Statue of Liberty-Ellis Island Found., 926 F.2d 134, 141 (2d Cir.1991) ("We have not hesitated to affirm a summary judgment when the only proof proffered in opposition amounts to nothing more than speculation and conjecture.") (citation omitted). In any event, Long's affidavit does not indicate that Sawyer and South Central Petroleum were aware of their right to acquire their share of the Texaco property during the foreclosure litigation mentioned by Long.
 
 
 9
 Under Arkansas law, four elements must be satisfied to apply the doctrine of estoppel:
 
 
 10
 (1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel had a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.
 
 
 11
 Burdine v. Dow Chem. Co., 923 F.2d 633, 635 (8th Cir.1991) (citations omitted). Despite raising waiver as an affirmative defense, Long Brothers has not established the first element of knowledge. For that matter, the second element of intention has not been satisfied either. As the district court noted, even if Sawyer and South Central Petroleum were aware of their right, "there is simply no showing whatsoever that the failure to be involved in the foreclosure litigation is inconsistent with an intention to enforce the contract with Long Brothers assuming that Long Brothers received title to the property." Thus, Long Brothers' waiver argument fails, and we interpret the contract as we would any other.
 
 
 12
 The contract provided for termination upon thirty days notice. Long Brothers elected termination on February 14, 1989. This termination took effect thirty days later on March 16, 1989. Long Brothers acquired the Texaco interest on March 15, 1989, at which time the agreement remained effective. Accordingly, the district court correctly granted summary judgment for Sawyer and South Central Petroleum and ordered Long Brothers to transfer one-half of the acquired Texaco interest to Sawyer and South Central Petroleum.
 
 II.
 
 13
 Following its summary judgment order for specific performance, the district court held a trial to assist it in fashioning an appropriate remedy. After this trial, rounding all figures to the nearest dollar, the district court ordered that Sawyer and South Central Petroleum pay Long Brothers $88,928 in acquisition costs and $2,000 in attorneys fees. Neither party disputes the $90,928 amount. Long Brothers objects, however, to the district court's award of an offset credit in favor of Sawyer and South Central Petroleum, which reduced the amount they owed to Long Brothers by $28,301.
 
 
 14
 Under the law of Arkansas, a cotenant possesses a right of accounting for revenues (minus expenses) stemming from the exploitation of oil wells. See Ark.Code Ann. § 18-60-101 (Michie 1987) (generally establishing a right to accounting); Fife v. Thompson, 288 Ark. 620, 708 S.W.2d 611, 612 (1986) (applying general right of accounting to oil extraction). The district court calculated the offset amount ($28,301) by subtracting Long Brothers' operating costs ($12,344) from the revenues produced by the acquired interest ($63,692), and then adding six percent in prejudgment interest ($2,628), see Ark. Const. Art. 19, § 13, to one-half of this difference. Long Brothers argues that the trial court inappropriately relied on hearsay evidence in making this calculation.
 
 
 15
 To determine the offset, the district court admitted the expert opinions of witnesses for both parties. The district court admitted this evidence under the evidentiary rule permitting an expert to rely upon hearsay in forming an opinion as long as the hearsay evidence itself remains inadmissible. See Fed.R.Evid. 703. Indeed, the district court recognized that Sawyer's and South Central Petroleum's expert's testimony involved triple hearsay, because the expert based his opinion on information obtained from a commercial production service, which received its information from the state, which in turn obtained its information from the operator of the well, and none of these sources testified at the trial. Sawyer's and South Central Petroleum's expert presented his revenue conclusion in an exhibit, which also listed the production figures on which he based his opinion. As the expert explained, the spreadsheet-like exhibit listed the underlying data and reflected the calculations that formed his opinion. Thus, when the district court accepted the expert's revenue charts, it also allowed the underlying data to be at the court's disposal.
 
 
 16
 Long Brothers objects to this, and contends that it demonstrates that the district court improperly relied on hearsay evidence. When the district court admitted the exhibit, however, it limited the admission to the expert's opinion, and not to the underlying figures, as required by Federal Rule of Evidence 703. As the district court explained:
 
 
 17
 I'm going to admit the exhibit. I think that it does qualify under the rule that experts may testify as to conclusions based on evidence that's not itself independently admissible.
 
 
 18
 This statement convinces us that the district court did not blur the evidentiary distinction which Long Brothers argues was violated. See Harris v. Rivera, 454 U.S. 339, 346, 102 S.Ct. 460, 464, 70 L.Ed.2d 530 (1981) ("In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions."); see also Sinclair v. United States, 279 U.S. 749, 767, 49 S.Ct. 471, 477, 73 L.Ed. 938 (1929).
 
 
 19
 "The admission of opinion testimony is committed to the broad discretion of the trial court." Hurst v. United States, 882 F.2d 306, 311 (8th Cir.1989) (citation omitted). The Federal Rules of Evidence permit experts to rely on inadmissible information in forming their opinion as long as the underlying information be "of a type reasonably relied upon by experts in the particular field...." Fed.R.Evid. 703. Indeed, "[a] trial court should exclude an expert opinion only if it is so fundamentally unsupported that it cannot help the factfinder.... Any weaknesses in the factual underpinnings of (the expert's) opinion go to the weight and credibility of his testimony, not to its admissibility." Hurst, 882 F.2d at 311 (citations omitted). Here, the district court expressly limited the admission to the expert's opinion and did not admit the information on which the expert based his opinion. Moreover, Long Brothers does not dispute that their opponent's expert based his opinion on information reasonably relied upon by experts in the field. In fact, Long Brothers' expert relied on the same type of production figures on which Sawyer's and South Central Petroleum's expert based his opinion. We therefore do not believe that the district court abused its discretion in admitting the contested expert testimony.
 
 III.
 
 20
 Long Brothers finally argues[2] that Sawyer and South Central Petroleum should not receive an offset for the Silberberg B-1's profits during the twenty-three months that Sawyer and South Central did not exercise their ownership rights, because Sawyer and South Central did not offer any evidence that Long Brothers actually received income from the Silberberg B-1 well. During most of the 23-month period in question, Long Brothers was in receivership, and thus, Long Brothers did not directly receive the income from the well. The receiver probably used the income from the Silberberg B-1 to benefit Long Brothers, but no evidence documented this probability. Even so, Sawyer and South Central Petroleum still had a right under their agreement with Long Brothers to receive one-half of the profits from the Silberberg B-1. Because Long Brothers failed to notify Sawyer and South Central Petroleum that it had purchased the Texaco interest, even though the parties contracted to work together to acquire this interest and share its purchase and ownership, equity demands that Long Brothers compensate Sawyer and South Central Petroleum for lost profits. For this reason, we do not find Long Brother's argument persuasive.
 
 
 21
 Accordingly, we affirm the district court's order.
 
 
 
 [1]
 Long Brothers also characterizes its agreement with Sawyer and South Central as ambiguous and therefore argues that the terms can be interpreted in several rational ways. Because we find the contract to be clear, we find no merit in this argument. Long Brothers further urges that the frustration of purpose doctrine prevents the enforcement of the agreement because the agreement contemplated the quick resale of the Texaco acquisition. This argument ignores the terms of the agreement which expressly provides that "[s]hould the Texaco interest be acquired for the parties to hold or sell in some undefined time in the future, the purchase price will be shared and the Texaco interest will be owned as follows: ...."
 
 
 [2]
 Long Brothers further argues that the district court's ruling allows Sawyer and South Central Petroleum to benefit from Long Brothers' exercise of its preferential purchase right without Sawyer and South Central paying for this benefit. At the time of its agreement with Sawyer and South Central, Long Brothers knew it possessed the preferential purchase right. Hence, when Long Brothers negotiated the agreement, the burden was on it to gain consideration in exchange for permitting Sawyer and South Central Petroleum to possibly share the benefit of the preferential purchase right