**FARESE v. UNITED STATES.**
No. 4762.

United States Court of Appeals
First Circuit.
Jan. 13, 1954.

Francis Juggins, Boston, Mass. (Leonard A. Kelley, Boston, Mass., with him on brief), for appellant.

Charles F. Choate, Asst. U. S. Atty., Boston, Mass. (Anthony Julian, U. S. Atty., and Edward D. Hassan, Asst. U.

S. Atty., Boston, Mass., with him on brief), for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

Alfred P. Farese appeals from a judgment of the district court, entered February 20, 1953, imposing upon him a sentence of imprisonment for one year upon conviction of contempt of court.

It appears that there were pending before the district court, early in February, 1953, two criminal proceedings upon grand jury indictments. In one of them (Crim.No. 52-94) Russell H. Peel, Jr., as sole defendant, had been indicted for transporting a stolen motor vehicle in interstate commerce on or about March 3, 1951, knowing the same to have been stolen, in violation of 18 U.S.C. § 2312. Originally, Peel had pleaded not guilty to this indictment. In the other proceeding, an indictment in five counts had been handed down against Frederick J. Martineau, Douglas W. Pike and Russell H. Peel, Jr., as joint defendants, charging that they had, on various dates in 1951 and early 1952, transported certain stolen motor vehicles in interstate commerce, knowing the same to have been stolen, in violation of 18 U.S.C. § 2312. Defendants Martineau, Pike and Peel had each pleaded not guilty to this indictment.

The two cases were called by the district court at a session on the afternoon of February 9, 1953. In No. 52-94 Peel then withdrew his plea of not guilty, and entered a plea of guilty. This action by Peel apparently came as a surprise to Martineau and Pike, co-defendants with Peel in No. 52-128, and to their respective counsel, appellant Farese being counsel of record for defendant Pike. When No. 52-128 was called, it was continued for trial to February 12, 1953. Naturally defendants Martineau and Pike, and Farese as Pike's counsel, were apprehensive, from Peel's action in pleading guilty in No. 52-94, that he might also enter a plea of guilty, and turn state's evidence, in No. 52-128 when that case came on for trial on February 12, 1953.

This apprehension proved to be well-founded. On February 12, 1953, when No. 52-128 was called for trial, co-defendant Peel withdrew his plea of not guilty and entered a plea of guilty on four of the five counts in that indictment, the other count against him being dismissed. A jury trial of defendants Martineau and Pike then commenced. On the next day, February 13, 1953, Peel was called as a witness for the prosecution and he testified at some length against the other two defendants.

In the course of Peel's cross-examination by attorney Farese, on behalf of defendant Pike, the following took place:

"Q. [By Mr. Farese] Were you promised anything by the District Attorney's Office or by the Federal Bureau of Investigation if you took this stand? A. No, but I was promised something by you the other day in the courtroom.

"Q. Did you ever talk to me? A. No, but you told me something—

"Q. I will let you bring that out. You never talked to me? A. No, I didn't; I wouldn't want to.

"Q. Mr. Peel—

"The Court: I want to know right now what you meant by that statement.

"The Witness: Yes, your Honor.

"Mr. Farese: I am going to ask him right now.

"The Witness: The other day he approached my wife and another lady in the corridor.

"The Court: Who did?

"The Witness: Mr. Farese. He told them if I took the stand some harm would come to me.

"The Court: Is your wife here?

"The Witness: They are both present, the wife and the other lady.

"Mr. Farese: I want her to take the stand. I have just been accused of something—

"The Court: Stop it. Leave the stand and have these two women come up right now."

At this point the district court interrupted the main trial and conducted a preliminary examination of Mrs. Ruth Peel, wife of the defendant Peel, and of another witness, Mrs. Alice Menchin. They testified to alleged threats as to what would happen to Peel if he should turn state's evidence in No. 52-128, which threats they asserted attorney Farese had communicated to Mrs. Peel in the corridor outside the courtroom after the proceedings in the two cases had been concluded for the day on February 9, 1953.

Thereupon, on February 13, 1953, the court, in compliance with the procedure laid down in Rule 42(b) of the Federal Rules of Criminal Procedure, 18 U.S.C., addressed appellant Farese as follows:

"Attorney Farese: Notice is hereby given you to appear before this Court on Wednesday, February 18 at 10 a. m. to show cause why you should not be held in criminal contempt, it being charged that during the trial of the case of United States against Pike et al. and in the corridors adjacent to the trial room you, being attorney for the defendant Pike, did attempt to intimidate the wife of the defendant Peel and the co-defendant Peel by direct and indirect threats of bodily harm to the said Peel if the said Peel testified against the said Pike."

The charge of criminal contempt came on for hearing on February 18, 1953, as scheduled.

Mrs. Peel testified, corroborated in material part by Mrs. Menchin, that when they went out into the corridor at the conclusion of the court proceedings on the afternoon of February 9, 1953, Mrs. Pike brought over attorney Farese and introduced him to Mrs. Peel; that Mr. Farese started off the conversation by inquiring "What's the big idea" of Peel's pleading guilty and whether he had the intention of turning state's evidence; that Farese made three comments of a threatening character in the course of the conversation: (1) "You know what happens to stool-pigeons. There's ways of getting at stool-pigeons at Norfolk. They've even been knifed or killed for stooling, and sometimes they even get to their families"; (2) "If he turns State's evidence, all I have to do is to write a couple of letters"; and (3) "If he turns State's evidence I'll break him in halves, I'll tear him wide open." Further, Mrs. Peel testified that Farese told her she had better go out to Norfolk the next day and find out what her husband had to say, "and call Mrs. Pike and let her know so that she can call me and we'll have something to work on." It appears that defendants Martineau and Pike were out in the corridor at that time, but that Peel was not there, he having been taken by a deputy marshal back to Norfolk Prison Colony.

On the same afternoon, and this seems to be unquestioned, Mrs. Peel telephoned to the FBI and reported to Special Agent Schwotzer the conversation she claimed to have had with attorney Farese. As a result Mr. Schwotzer brought the matter to the attention of the Assistant U. S. Attorney in charge of No. 52-128. The next day the U. S. Attorney's office got in touch with Farese and informed him that this complaint of attempted intimidation had been lodged against him.

Appellant Farese, testifying in his own behalf, denied that he had made any threats to Mrs. Peel; and in this he was corroborated to a certain extent by other witnesses whom he called. He was unable to suggest any motive why Mrs. Peel should deliberately concoct such a story, but intimated that perhaps Mrs. Peel had misinterpreted a remark, innocently intended, and addressed to defendant Pike rather than to Mrs. Peel, with reference to what was likely to happen to a "stool-pigeon".

At the conclusion of the testimony the district court made a finding of guilty of criminal contempt as charged. The conflicting testimony presented a clear issue of credibility; and we would be

obliged to accept as conclusive this finding of the district court, provided the offense charged was a criminal contempt which could be tried and punished by the court sitting without a jury.

The power of the district court to impose punishment for contempt of its authority is defined and limited by 18 U.S.C. § 401:

> "A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—
>
> "(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
>
> "(2) Misbehavior of any of its officers in their official transactions;
>
> "(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

This provision was derived originally from § 1 of the act of March 2, 1831, 4 Stat. 487, § 2 of which act provided:

> "That if any person or persons shall, corruptly, or by threats or force, endeavour to influence, intimidate, or impede any juror, witness, or officer, in any court of the United States, in the discharge of his duty, or shall, corruptly, or by threats or force, obstruct, or impede, or endeavour to obstruct or impede, the due administration of justice therein, every person or persons, so offending, shall be liable to prosecution therefor, by indictment, and shall, on conviction thereof, be punished, by fine not exceeding five hundred dollars, or by imprisonment, not exceeding three months, or both, according to the nature and aggravation of the offence."

The statutory crime thus described in § 2 of the act of March 2, 1831, is now found, in substance, in 18 U.S.C. § 1503.

■■ Whatever may have been the earlier expressions of doubt as to the constitutional authority of Congress to curtail this "inherent" contempt power of the courts, it is now well-settled that the district court could not go beyond the statutory boundaries of 18 U.S.C. § 401 in imposing summary punishment for a criminal contempt. See Michaelson v. United States ex rel. Chicago, St. P., M. & O. R. Co., 1924, 266 U.S. 42, 45 S.Ct. 18, 69 L.Ed. 162; Nye v. United States, 1941, 313 U.S. 33, 61 S. Ct. 810, 85 L.Ed. 1172; In re Michael, 1945, 326 U.S. 224, 66 S.Ct. 78, 90 L.Ed. 30. And it is the clear teaching of the Nye and Michael cases that the grant of summary contempt power, as contained in 18 U.S.C. § 401, is to be grudgingly construed, so that the instances where there is no right to a jury trial will be narrowly restricted to the bedrock cases where concession of this drastic power to the courts is necessary to enable them to preserve their authority and to insure the maintenance of order and decorum in the proceedings before them.

■ In the present case 18 U.S.C. § 401(3) has no possible relevance. Nor has it been suggested that the judgment now under review might rest on 18 U. S.C. § 401(2): "Misbehavior of any of its officers in their official transactions". The holding in Schmidt v. United States, 6 Cir., 1941, 124 F.2d 177, is a precedent against any such interpretation of § 401 (2). Attorney Farese was no doubt an officer of the court; but it would require much too broad and loose a reading of § 401(2) to regard his alleged conversation with Mrs. Peel, after the case was through for the day, as part of his "official transactions" in his capacity as an officer of the court. If this were not so, then the conversation, wherever it took place, even if it occurred miles away from the courthouse, would be a criminal contempt punishable summarily by the court under § 401(2).

The conviction, therefore, if it is to be sustained at all, must necessarily rest upon 18 U.S.C. § 401(1); that is, it must be such contempt of the court's authority as constitutes misbehavior "in its presence or so near thereto as to obstruct the administration of justice".

■ Under the clear dictum, if not the holding, in Nye v. United States, supra, the alleged offense here cannot be said to constitute "misbehavior * * * so near" the presence of the court "as to obstruct the administration of justice", within the meaning of § 401(1), for that expression is limited to "misbehavior in the vicinity of the court disrupting to quiet and order or actually interrupting the court in the conduct of its business." 313 U.S. at page 52, 61 S.Ct. at page 817. Accord: Wimberly v. United States, 5 Cir., 1941, 119 F.2d 713. But if the misconduct here found may be deemed to have been committed in the "presence" of the court, then the concept of "misbehavior" within the meaning of § 401(1) is somewhat broader, and is not necessarily limited to that type of misbehavior which is calculated to disturb the order of the court, such as noise or tumultuous conduct tending to prevent the court from proceeding in the orderly despatch of its business. It may be that this distinction is somewhat illogical, in view of the language of § 401(1); but as a lower federal court we feel obliged to accept it in view of the decision of the Supreme Court in Ex parte Savin, 1889, 131 U.S. 267, 9 S.Ct. 699, 33 L.Ed. 150, which held that a surreptitious attempt, in the "presence" of the court, to bribe a witness about to testify in a pending proceeding could be punished as a criminal contempt under Rev.Stat. § 725, the statutory precursor of the present 18 U.S.C. § 401(1). That was a unanimous opinion of the Court; and the majority opinion in Nye v. United States, supra, while it cites the Savin case at several places, and undertakes to distinguish it, does not purport to overrule it. Mr. Justice Stone, dissenting in the Nye case, 313 U.S. at page 56, 61 S.Ct. at page 819, expressed it as his understanding that the Court did not intend to overrule the Savin case. See also In re Presentment by Grand Jury of Ellison, D.C. Del.1942, 44 F.Supp. 375, affirmed, 3 Cir., 1943, 133 F.2d 903, certiorari denied, 1943, 318 U.S. 791, 63 S.Ct. 995, 87 L.Ed. 1157. Cf. Sinclair v. United States, 1929, 279 U.S. 749, 49 S.Ct. 471, 73 L.Ed. 938; Clark v. United States, 1933, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993; Cooke v. United States, 1925, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767.

In Carlson v. United States, 1 Cir., 209 F.2d 209, we had recent occasion to say: "When 18 U.S.C. § 401(1) includes, as a criminal contempt of the court's authority, misbehavior in the 'presence' of the court, the word 'presence' is used in a brooding, metaphorical sense broader than misbehavior in the 'actual presence' of the judge as used in Rule 42(a). The grand jury is an arm of the court; and no doubt there may be instances of misbehavior in the grand jury room that constitute a completed offense of criminal contempt of court because committed in the 'presence' of the court within that broader meaning of 18 U.S.C. § 401(1)." That proposition, also, was decided by the Supreme Court in the Savin case. There a certain witness, under subpoena, and in attendance upon the court, was awaiting a call to testify at a trial then going on. The defendant Savin was found to have committed two acts of misconduct with reference to this witness: (1) He approached said witness in the jury room of the court, located within seven feet of the courtroom and then temporarily being used as a witness-room, and unlawfully attempted to deter the witness from testifying for the government in the pending action; and (2) in the hallway of the court building he offered the witness money not to testify for the government at the then pending trial. It was held that these acts of misconduct constituted misbehavior in the "presence" of the court punishable as a criminal contempt, despite the fact that the attempted bribery of the witness was also punishable as an ordinary crime under § 5399 of the Revised Statutes. The Court said, 131 U.S. at page 277, 9 S.Ct. at page 701: "The jury-room and hallway where the misbehavior occurred, were parts of the place in which the court was required by law to hold its sessions. * * * We are of opinion

that, within the meaning of the statute, the court, at least when in session, is present in every part of the place set apart for its own use, and for the use of its officers, jurors, and witnesses; and misbehavior anywhere in such place is misbehavior in the presence of the court." See also Cooke v. United States, 1925, 267 U.S. 517, 535, 45 S.Ct. 390, 69 L.Ed. 767.

■ Notwithstanding the potential elasticity of the metaphorical expression "in its [the court's] presence" as used in 18 U.S.C. § 401(1), we ought not to give that statutory language an application beyond the clear requirements of the controlling Supreme Court cases. In accordance with the admonitions in Nye v. United States and In re Michael, supra, our disposition should be to restrict narrowly the instances where an accused may be summarily punished by the court without a right to a jury trial.

The situation presented in the case at bar goes quite far beyond the Savin case. Mrs. Peel was not in attendance upon the court, about to testify in a trial then proceeding. It does not even appear that she was a prospective witness in Crim.No. 52-128, which was set for trial several days later. Her presence in the corridor outside the court, along with the others in the group, was unrelated to any business then going on in the courtroom, if indeed the court had not already adjourned for the day, which does not appear. The corridor was not then being used as an assembly place for witnesses in attendance upon the court. Under these circumstances it seems to us an undue stretching of this concept of "presence" to say that the court was then and there present in the corridor, where no court business was currently being transacted.

Furthermore, we do not see how it could be said that Farese's conduct in the corridor, reprehensible as it may be, obstructed the administration of justice, which is of the essence of a criminal contempt of the court's authority. If the incident had stopped there, it obviously would have had no effect at all

upon the subsequent trial of Crim.No. 52-128, any more than if Farese had written a letter in the corridor, addressed to a henchman, requesting him to bring pressure upon Peel at Norfolk Prison Colony not to turn state's evidence, and had dropped that letter in the mail box in the corridor outside the courtroom. The presence of Mrs. Peel out in the corridor, when the alleged conversation took place, was pure happenstance; the conversation there no more obstructed the administration of justice than if it had taken place at Mrs. Peel's home many miles away.

■ It may be inferred from Peel's testimony on February 13, 1953, at the trial of Crim.No. 52-128, that Peel did learn some time prior thereto of the alleged threatening remarks which Farese had made to Mrs. Peel out in the corridor on February 9. It also incidentally appears, from the cross-examination of Mrs. Peel at the hearing on criminal contempt, that Mrs. Peel had not seen her husband after the conversation with Farese on February 9 until she saw him in the office of the U. S. Marshal on the morning of February 12, which presumably was just before the opening of the trial in Crim.No. 52-128. Perhaps Mrs. Peel at that time passed on to her husband the threatening remarks, or possibly she had already communicated them to him in some other way in the intervening days. A contention might be suggested that when Farese made the threats to Mrs. Peel on February 9, he intended that she should pass them on to her husband and thus to deflect Peel from any possible purpose of turning state's evidence; that if Mrs. Peel transmitted these threats to her husband in the Marshal's office, where Peel was in attendance upon the court, waiting a call to go into the impending trial of Crim.No. 52-128, this would in legal effect be the same as if Farese himself had made the threats to Peel in the Marshal's office; and that within the holding of the Savin case, supra, such conduct in the Marshal's office would constitute misbehavior in the "presence" of

the court within the meaning of § 401 (1), and thus a criminal contempt on the part of Farese. But as this case comes to us, we do not have to examine into that possibility. If anything like this took place in the Marshal's office, it is only a matter of speculative inference from an incidental fragment of Mrs. Peel's cross-examination. It was not developed as a part of the prosecution's case. And indeed it was not a part of the prosecution's case, since the charge of criminal contempt which Farese was called upon to answer, as stated in the oral notice which the court served upon Farese on February 13, 1953, in compliance with Rule 42(b), was contumacious misbehavior of Farese "in the corridors adjacent to the trial room". Neither the prosecution, nor the defense, was directed to any incident occurring in the Marshal's office.

Our vacation of the present judgment of course has no bearing upon a possible indictment and prosecution of Farese under 18 U.S.C. § 1503.

The judgment of the District Court is vacated, and the case is remanded to that Court with direction to dismiss the proceeding in criminal contempt.