**Harold I. CAMMER, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 12353.**

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 29, 1954.

Decided May 5, 1955.

As Amended May 12, 1955.

---

1. Apparently the tenth such since he has been confined.

Mr. Oliver Gasch, Asst. U. S. Atty., Washington, D. C., with whom Messrs. Leo A. Rover, U. S. Atty., and Lewis Carroll, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellee.

Before WILBUR K. MILLER, FAHY and DANAHER, Circuit Judges.

DANAHER, Circuit Judge.

Cammer appeals from an order adjudging him guilty of criminal contempt. The essential facts are that Cammer is attorney of record for one Gold; on August 28, 1953, an indictment was returned against Gold by the May 1953 grand jury; the grand jury after Gold's indictment subpoenaed other persons represented by Cammer; on September 22, 1953, Cammer appeared in the District Court on behalf of these other persons and moved to quash and vacate the subpoenas served upon them; on this same day and the day following, September 22 and 23, 1953, Cammer sent identical letters and questionnaires to some fifteen members of the grand jury who were federal employees, and in so doing, Cammer acted without the permission or knowledge of the District Court. The questionnaires related in general to the effect of the government's loyalty program on the grand jurors. The letter accompanying the questionnaire stated that it was being submitted "in the interest of the fair administration of criminal justice" and urged that it was the recipient's "duty as a citizen to help enlighten the court on an issue which affects the liberty of a citizen on trial in a criminal case."

The trial judge found that the questionnaires harassed the jurors and impinged upon their freedom of thought and decision. He described Cammer's action as "intolerable" but concluded that a fine of $100 would be sufficient punishment since there was some doubt as to whether Cammer's acts "were committed in conscious wrong."

Cammer's contempt was adjudged specifically under § 401 of the Federal

Mr. Charles E. Ford, Washington, D. C., for appellant.

Contempt Statute, 18 U.S.C. § 401 (1952),[1] which provides as follows:

"A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none others, as—

"(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

"(2) Misbehavior of any of its officers in their official transactions; '

"(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

The government's application for an order to show cause was predicated upon acts and conduct said to constitute a violation of subsection (2) of the foregoing section. Although appellant set up certain defenses which will not be detailed, his answer admitted all allegations of the government's petition except the following:

"The acts and conduct of Harold I. Cammer, as set forth in the foregoing paragraphs, constitute:

"Misbehavior by an officer of this Court in his official transactions with this Court, in violation of section 401, Title 18 U.S.C."

■ The power of Congress to legislate with respect to the contempt powers of the federal courts other than the Supreme Court, is not open to question. "These courts were created by acts of Congress. Their powers and duties depend upon the act calling them into existence, or subsequent acts extending or limiting their jurisdiction. The act of 1831 is, therefore, to them the law specifying the cases in which summary punishment for contempts may be inflicted." Ex parte Robinson, 1873, 19 Wall. 505, 510–511, 22 L.Ed. 205. The contempt statute has been described as an attempt by Congress "drastically" to limit the contempt powers of the courts. In re Michael, 1945, 326 U.S. 224, 227, 66 S.Ct. 78, 90 L.Ed. 30; Nye v. United States, 1941, 313 U.S. 33, 44–48, 61 S.Ct. 810. The Michael and Nye cases emphasize, however, that the main concern of Congress and the Supreme Court is not to protect contemptuous conduct, but to prevent abuses which may result from summary punishment.

Under the terms of 18 U.S.C. § 401(2), we inquire whether: (1) Cammer was an officer of the court, (2) engaged in an official transaction, (3) whose conduct constituted misbehavior. For the reasons which follow, the majority answers these questions affirmatively, though with great respect for the contrary views of our colleague.

1. *Cammer was an officer of the court.*

■ It seems clear that attorneys are officers of the court within the intendment of the statute. In Ex parte Garland, 1866, 4 Wall. 333, 378, 18 L.Ed. 366, Justice Field said: "[Attorneys] are officers of the court, admitted as such by its order, upon evidence of their possessing sufficient legal learning and fair private character. . . . The order of admission is the judgment of the court that the parties possess the requisite qualifications as attorneys and counsellors, and are entitled to appear as such and conduct causes therein. From its entry the parties become officers of the court, and are responsible to it for professional misconduct. They hold their office during good behavior, and can only be deprived of it for misconduct ascertained and declared by the judgment of the court after opportunity to be heard has been afforded." See also, Ex parte Robinson, 1873, 19 Wall. 505, 512, 22 L.Ed. 205; Ex parte Bradley, 1868, 7 Wall. 364, 374, 19 L.Ed. 214, and Tanner v. United States, 10 Cir., 1932, 62 F.2d 601, certiorari denied 1933, 289

---

1. Although Nye v. United States, 1941, 313 U.S. 33, 61 S.Ct. 810, 85 L.Ed. 1172, involves a complaint for violation of the first subsection of 18 U.S.C. § 401, important background material is presented in 313 U.S. at page 44 et seq., 61 S.Ct.

at page 813 et seq. Earlier treatment of the derivation of the statute is presented by Mr. Justice Harlan in Savin, Petitioner, 1889, 131 U.S. 267, 274 et seq., 9 S.Ct. 699, 33 L.Ed. 150.

U.S. 746, 53 S.Ct. 689, 77 L.Ed. 1492, all of which involved contempt situations.[2]

2. *Cammer was engaged in an official transaction.*

■ That Cammer, as an "officer of the court," was engaged in an official transaction is clear. The facts show beyond dispute that Cammer's actions occurred while he was directly engaged "in the practice of the profession." Ex parte Bradley, supra, 7 Wall. at page 374, 19 L.Ed. 214. The grand jury had just indicted one of his clients, and as he knew, currently had others under investigation. Each letter identified Cammer as attorney for the indicted client, Gold, and stated that he was addressing it to all federal government employees "who sat on the Grand Jury which indicted Mr. Gold." Cammer's letter, appealing directly to the grand jurors' purported duty "to help enlighten the court," transmitted a questionnaire containing inquiries, a few samples of which will demonstrate its inevitable impact on the grand jurors.[3]

■ The grand jury is an appendage of the court and "proceedings before it are to be regarded as being proceedings in the court." Camarota v. United States, 3 Cir., 1940, 111 F.2d 243, 246, certiorari denied 1940, 311 U.S. 651, 61 S.Ct. 16, 85 L.Ed. 416. See also, United States v. Smyth, D.C.N.D.Cal.1952, 104 F.Supp. 283, 291. The grand jury acts "under the authority of the court," we note in Savin, Petitioner, 1889, 131 U.S. 267, 277, 9 S.Ct. 699, 702, which predicated Justice Cardozo's pronouncements "A talesman when accepted as a juror becomes a part or member of the court", Clark v. United States, 1933, 289 U.S. 1, 11, and again at page 12, 53 S.Ct. 465, at page 468, 77 L.Ed. 993, "A talesman, sworn as a juror, becomes, like an attorney, an officer of the court, and must submit to like restraints." That Cammer, in so communicating with an official arm of the court while conducting the court's business, was engaged in an official transaction cannot be doubted.

In urging that the statute does not apply in such circumstances appellant relies on the Nye, Michael and second Schmidt (6 Cir., 1941, 124 F.2d 177) cases. The Nye proceedings, brought under the *first* subsection of 18 U.S.C. § 401, did not involve an officer of the

---

**2.** No point is made of the fact that the District Court admitted Cammer only *pro hac vice.* This would appear to be immaterial since the alleged contempt occurred in connection with the specific cases in which he was authorized to appear. See Bowles v. United States, 4 Cir., 1931, 50 F.2d 848, 851 certiorari denied 1931, 284 U.S. 648, 52 S.Ct. 29, 76 L.Ed. 550.

**3.** "In what department of the Federal Government are you employed?

\*   \*   \*   \*   \*   \*

"Do you think that it is wise or safe for a government employee to express views on a controversial question different from the position of the Government?

\*   \*   \*   \*   \*   \*

"Do you think a government employee could get into trouble if he gave a truthful character affidavit for use at a hearing in which the fellow employee is charged with disloyalty to his Government?

\*   \*   \*   \*   \*   \*

"Are you involved in a loyalty proceeding? Have you ever been involved in such a proceeding?

"Are you concerned about possible involvement in a loyalty proceeding in the future?

"Do you believe that a government employee might some day have to explain his action in a loyalty proceeding if, as a juror, he voted to acquit or not to indict a person who was widely publicized as a past or present communist?

\*   \*   \*   \*   \*   \*

"Do you think that such a vote might affect his employment status in any way, such as possible promotions, assignments, or selection for layoff in the current reductions in force? If so, how?

"Do you believe that a government employee's obligation to the Federal Government and to its program of fight communism would be consistent with his voting to acquit or refuse to indict a man officially charged by our Government with communist activity?

\*   \*   \*   \*   \*   \*

"Did you mention to or discuss the receipt of this questionnaire with any attorney or representative of the Department of Justice or with your superiors on your job? If so, with whom?"

court, and the alleged contemnors, in fact, were not even parties to the litigation. The Court's opinion stated, 313 U.S. at page 44, 61 S.Ct. at page 814: "The question is whether the conduct of petitioners constituted 'misbehavior . . . so near' the presence of the court 'as to obstruct the administration of justice' . . .." Concluding that the words have a geographical connotation, the majority ruled that the reprehensible conduct was not punishable as contempt within the meaning of § 401(1) though of a kind which corrupts the judicial process and impedes the administration of justice. The case on its facts has nothing to do with our problem. In the Michael case, supra [326 U.S. 224, 66 S.Ct. 78], the contemnor, a court appointed trustee, had been adjudged guilty of contempt because of "false and evasive" testimony before a grand jury. The issues were not unlike those presented in Ex parte Hudgings, 1919, 249 U.S. 378, 39 S.Ct. 337, 63 L.Ed. 656. The Court noted that perjury alone does not constitute an "obstruction" of justice within § 401(1), and that element must be clearly shown where contempt is charged. The opinion cited Clark v. United States, supra, as an example of obstruction where a prospective juror had falsely testified in order to qualify. "It is difficult to conceive of a more effective obstruction to the judicial process than a juror who has prejudged the case," wrote Justice Black, 326 U.S. at page 228, 66 S.Ct. at page 80, pointing out further that "the mere fact that false swearing is an incident to the obstruction charged does not immunize the culprit from contempt proceedings." But perjury alone did not predicate contempt proceedings under § 401(1), nor could the conviction be sustained under § 401(2) where the contemnor, though an officer of the court, was not engaged in an official transaction while testifying generally before the grand jury. In short, where the charge of perjury could be prosecuted with determination of guilt by a jury, that course, rather than summary contempt action, should be followed where there was lacking the element of obstruction of justice. The Michael case offers no comfort to one who either sought to influence the jury as it transacted its business, or whose insinuating and unauthorized communications might have affected the grand jury's official consideration of the case against Cammer's clients.[4] In the second Schmidt case, as is clear from the facts which appear in the court's first opinion (6 Cir., 115 F.2d 394), the court again was concerned primarily with the first rather than the second subsection of 18 U.S.C. § 401. In fact, it was stated in open court by the Government that no complaint was made in that case under the second subsection. Moreover, while attorneys were involved, they did not themselves make contacts with grand jurors, and their alleged contempts occurred when the court was not in session and grew out of actions they advised the clients to take. In brief, the cases relied upon by appellant may be distinguished, and none involves direct dealing between two officers of the court in a matter of official concern to both, as in the present situation.

*3. Cammer's conduct constituted misbehavior.*

For many practical reasons the courts have sought to protect grand juries in the exercise of their historic and important function, investing their deliberations with the seal of secrecy, protect-

---

**4.** Cf. Remmer v. United States, 1954, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L. Ed. 654, where the Court said: "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. . . . A juror must feel free to exercise his functions without the F.B.I. or anyone else looking over his shoulder. The integrity of jury proceedings must not be jeopardized by unauthorized invasions. . . ."

ing the jurors against harassment and otherwise recognizing their valued contributions in judicial administration.[5] Thus has evolved the rule requiring judicial approval of proposals to penetrate the shield. Schmidt v. United States, 6 Cir., 1940, 115 F.2d 394, 397, and cases there cited. See also, United States v. American Medical Ass'n, D.C. D.C.1939, 26 F.Supp. 429; In re Bullock, D.C.D.C.1952, 103 F.Supp. 639.[6]

Cammer cast aside an unusually convenient opportunity to consult with the judge about his contemplated action when, while attorney for Gold who had been indicted, he appeared before the court on the morning of the very day the questionnaires were sent out. He there sought to quash a subpoena duces tecum running to one of Gold's associates, and he knew that the grand jury was continuing its investigation. If he had acted in good faith, he could then have sought judicial supervision, instead of which he went forward with his plan, kept it secret to himself, acted without advice from the court, and yet implied in his letter that it was the jurors' "duty" to the court to respond to the questionnaires.

■ The record here amply substantiates a finding of misbehavior. As Judge Laws said in his opinion [122 F. Supp. 388]: "To harass [the jurors] by challenging and lengthy questions while they are deliberating or about to consider cases is intolerable. A timid juror will not fail to be disturbed, possibly influenced. A stalwart juror at least will be disturbed. Such an approach impinges freedom of thought and decision. Jurors will not serve competently if so harassed." Conduct similar in principle to that involved here has been condemned in many other cases.

In Sinclair v. United States, 1929, 279 U.S. 749, 765, 49 S.Ct. 471, 73 L.Ed. 938, the defendants in a criminal case had the jurors kept under surveillance whenever they were not actually within the court house. Investigations also were made concerning encumbrances on the home of one juror and to determine whether another had indicated his views during the trial. The Court upheld an adjudication of criminal contempt on these facts, even though it did not appear that any juror had actually been approached or communicated with or that any juror was conscious of the surveillance, although some jurors were suspicious. The punishment included heavy fines and imprisonment. Commenting on the conduct of the contemnors, the Court said, 279 U.S. at pages 764–765, 49 S.Ct. at page 476:

"That the acts here disclosed, and for which three of the appellants were certainly responsible, tended to obstruct the honest and fair administration of justice, we cannot doubt. The jury is an essential instrumentality—an appendage—of the court, the body ordained to pass upon guilt or innocence. Exercise of calm and informed judgment by its members is essential to proper

---

5. E. g., a defendant should not be permitted "to divert and turn back the course of a criminal case from a trial of himself to a trial of the grand jury and the prosecuting officers." United States v. American Medical Ass'n, D.C.D.C.1939, 26 F.Supp. 429, 430; United States v. Smyth, D.C.N.D.Cal.1952, 104 F.Supp. 283, 300–302; cf. Bradley v. Fisher, 1871, 13 Wall. 335, 347–348, 20 L.Ed. 646; Atwell v. United States, 4 Cir., 1908, 162 F. 97, 100, 17 L.R.A.,N.S., 1049.

6. In the latter case [103 F.Supp. 642], by the way, the reasons for secrecy are summarized as follows: "1. To prevent

the escape of those indicted; 2. To insure the grand jury freedom in its deliberations; 3. To prevent any persons from annoying the grand jurors; 4. To prevent subornation of perjury with witnesses who may testify before the grand jury and later appear at the trial of those indicted by it; 5. To encourage free and untrammeled disclosures by persons who have some information with respect to the commission of crimes, and, 6. To protect the innocent person, who is accused but exonerated, from the disclosure of the fact that he has been under investigation." See also, United States v. Amazon Industrial Chemical Corp., D.C.Md.1931, 55 F.2d 254, 261.

enforcement of law. The most exemplary resent having their footsteps dogged by private detectives. All know that men who accept such employment commonly lack fine scruples, often willfully misrepresent innocent conduct and manufacture charges. The mere suspicion that he, his family, and friends are being subjected to surveillance by such persons is enough to destroy the equilibrium of the average juror and render impossible the exercise of calm judgment upon patient consideration. If those fit for juries understand that they may be freely subjected to treatment like that here disclosed, they will either shun the burdens of the service or perform it with disquiet and disgust. Trial by capable juries, in important cases, probably would become an impossibility. . . . We can discover no reason for emasculating the power of courts to protect themselves against this odious thing."

In Ex parte Bradley, 1868, 7 Wall. 364, 374, 19 L.Ed. 214, the Court reversed a contempt adjudication against an attorney which had been premised on the first clause of the first section of the Act of March 2, 1831, which is the equivalent of 18 U.S.C. § 401(1). In so doing, however, the Court markedly contrasted the power of the courts under like circumstances "to punish attorneys as officers of the same, for misbehavior in the practice of the profession." With respect to this latter power, Mr. Justice Nelson speaking for the Court said, 7 Wall. at page 374, 19 L.Ed. 214:

"This power has been recognized and enforced ever since the organization of courts, and the admission of attorneys to practice therein. If guilty of fraud against their clients, or of stirring up litigation by corrupt devices, or using the forms of law to further the ends of injustice; in fine, for the commission of any other act of official or personal dishonesty and oppression, they become subject to the summary jurisdiction of the court. Indeed, in every instance where an attorney is charged by affidavit with fraud or malpractice in his profession, contrary to the principles of justice and common honesty, the court, on motion, will order him to appear and answer, and deal with him according as the facts may appear in the case. . . . [T]his is a distinct head of proceeding from that of contempt of court, or of the members thereof, committed in open court, or in immediate view and presence tending to interrupt its proceedings, or to impair the respect due to its authority. *This distinction is recognized in the act of 1831, already referred to, which, after providing for personal contempt in presence of the court, authorizes attachments to issue, and summary punishment to be inflicted, for 'the misbehavior of the officers of said courts in their official transactions.'* " (Emphasis supplied.)

In Tanner v. United States, 10 Cir., 1933, 62 F.2d 601, certiorari denied 1933, 289 U.S. 746, 53 S.Ct. 689, 77 L.Ed. 1492, an attorney after the jury returned its verdict in a case in which he was participating, encountered one of the jurors and proceeded to abuse the juror, who was a banker, for the small amount of damages awarded his client in the trial. The lawyer was adjudged in contempt, was fined $100, and suspended from practice until payment was made. The Court of Appeals upheld this conviction and made this pertinent comment, 62 F.2d at page 602:

"While the jury had returned a verdict in the Woody Case in which the juror had sat, he was still an officer of the court and would be called in subsequent cases. Appellant also was an officer of the court. The attack having been made by one officer of the court upon another because of the subject matter of a trial concluded only so far as the return of a verdict by the jury, we are of the opinion while the attack

was made outside of the courtroom and after the jury had returned its verdict, yet the case was still pending, and it was not only the right but the duty of the court to deal with the same. It is unthinkable a court should be so weak or supine, so wanting in constitutional power, as to not be able to protect its officers in the proper discharge of their sworn duty. That a juror, acting under his sworn duty in the administration of justice in one of our national courts, should be so basely accused and humiliated by an interested officer of the court, cannot be thought not to be included in the statutory law above quoted. No doubt jurors, if such conduct as is found in this record should go unpunished, would fear to do their sworn duty in an honest, impartial manner, as must be done in the administration of justice in our courts. We are of the opinion the judgment imposed for the offense by the attorney in this case was well within the statutory power conferred. Aside from this, the court was very moderate in his punishment, and for that the court is to be commended and not criticized for its timely action in this case."

In the first Schmidt case, supra, 6 Cir., 1940, 115 F.2d 394, several attorneys advised their clients that they could interrogate members of the grand jury relative to the evidence which had been submitted to it, and upon which indictments against them were based. The clients thereupon approached and interviewed a number of the grand jurors, and obtained affidavits which the attorneys submitted to the court in support of motions to quash the indictments. The attorneys were adjudged in contempt of court for their conduct. Commenting upon the attorneys' actions, the court said, 115 F.2d at page 396:

"The question of sincerity aside, the fact is that appellants' advice overlooked this oath and caused their clients and the grand jurors themselves to disregard it. The advice was given directly in the teeth of that clause of the oath which obligated the jurors to secrecy unless they were called upon in a court of justice to make disclosures, and of that portion of the court's charge to the grand jury hereinabove quoted. Advice which caused appellants' clients or the jurors themselves to disregard or ignore the oath was, per se, an unlawful interference with the proceedings of the court, and, however honestly given, was at least a technical contempt." [5]

■ Cammer urges upon us his alleged lack of intent, that there was an absence of conscious wrong. His reliance upon any such ground for exculpation is definitely misplaced. "In order that one may be held for contempt for communications with jurors, on the ground of the harmful tendency thereof, it is not necessary to prove that the communications had or the acts done were accompanied with a wrongful intent. It is sufficient if such acts and communications were knowingly and willfully done and had, and had the tendency to influence improperly the action of the jury." Kelly v. United States, 9 Cir., 1918, 250 F. 947, 950, certiorari denied 1919, 248 U.S. 585, 39 S.Ct. 182, 63 L.Ed. 433. In Duke v. United States, 4 Cir., 1937, 90 F.2d 840, 841, 112 A.L.R. 317, certiorari denied 1937, 302 U.S. 685, 58 S.Ct. 33, 82 L.Ed. 528, which arose under a statute which now appears at 18 U.S.C. § 1504 (1952), the defendant was charged with improperly com-

---

5. See also the exhaustive opinion of Chief Judge Fee in United States v. Smyth, D.C.N.D.Cal.1952, 104 F.Supp. 283, 303–304, in which he indicated that it would be contempt under 18 U.S.C. § 401 for an attorney, without a court order, to interrogate grand jurors about their motives or personal habits; and In re Grand Jury Proceedings, D.C.E.D.Pa. 1933, 4 F.Supp. 283, which also indicates that a court order is necessary in order to avoid contempt in questioning grand jurors.

municating with a grand jury. Rejecting as a matter of law the defense that he had acted "openly and without corrupt intent," the court said that under the facts of the case "the only question which can arise under the statute is whether the person accused of sending the letter did so. Every one is presumed to intend the natural and probable consequences of acts intentionally done." Once we find, as we do, that Cammer's conduct tended to harass the grand jurors, it is immaterial whether Cammer was motivated by an evil purpose, or not, but were we pressed on the point we could readily find that he was.

We are not unmindful that "the intention with which acts of contempt have been committed must necessarily and properly have an important bearing on the degree of guilt and the penalty which should be imposed . . . ." Cooke v. United States, 1925, 267 U.S. 517, 538, 45 S.Ct. 390, 395, 69 L.Ed. 767. Here the appellant had the full benefit of whatever mitigating circumstances could properly be urged in the light of the facts. The Cooke case requires no more. See also, Merrimack River Sav. Bank v. City of Clay Center, 1911, 219 U.S. 527, 536, 31 S.Ct. 295, 55 L.Ed. 320; Schmidt v. United States, 6 Cir., 1940, 115 F.2d 394, 398.

Chief Judge Laws concluded [122 F. Supp. 389]: "Granting respondent all favorable inferences, his acts clearly disregarded the protection which must be vouchsafed jurors. The Court finds him guilty of contempt and imposes a fine of $100."

The judgment is affirmed.

FAHY, Circuit Judge (dissenting).

The question is the narrow one whether the conduct for which appellant was adjudged by the court guilty of criminal contempt was that of an officer of the court in an official transaction. The only authority invoked to support the judgment is 18 U.S.C. § 401(2) (1952), empowering a court of the United States to punish by fine or imprisonment such contempt of its authority "and none other, as * * * (2) Misbehavior of any of its officers in their official transactions * * *." I assume the conduct was misbehavior within the meaning of this provision. And, of course, appellant as a member of the bar is an officer of the court. Ex parte Garland, 4 Wall. 333, 378, 71 U.S. 333, 378, 18 L.Ed. 366; Savings Bank v. Ward, 100 U.S. 195, 198, 25 L.Ed. 621; Powell v. State of Alabama, 287 U.S. 45, 73, 53 S.Ct. 55, 77 L.Ed. 158; Hickman v. Taylor, 329 U.S. 495, 510, 67 S.Ct. 385, 91 L.Ed. 451[1]; Booth v. Fletcher, 69 App.D.C. 351, 355, 101 F.2d 676, 680, certiorari denied, 307 U.S. 628, 59 S.Ct. 835, 83 L.Ed. 1511. But when he communicated by mail with grand jurors to obtain information in preparing his client's case he was not engaging in an official transaction as an officer of the court. In other words, I do not think Congress intended by § 401(2) to grant courts the power by summary proceedings to police such professional behavior of a member of the bar. The well known avenues for suspending, disbarring, or otherwise disciplining attorneys are available to reach their unprofessional and unethical conduct. The criminal law is available to punish them for criminal offenses, where they "will be afforded the normal safeguards surrounding criminal prosecutions." Nye v. United States, 313 U.S. 33, 53, 61 S.Ct. 810, 817, 85 L.Ed. 1172.[2] And contempt proceedings are also available to punish "[m]isbehavior of any person" in the court's presence or "so near thereto as to obstruct the administration of justice", or "[d]isobedience or resistance to" the court's "lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401(1) and (3) (1952). But the language of § 401(2), "[m]isbehavi-

---

1. For subsequent history see Hickman v. Taylor, 3 Cir., 170 F.2d 327, certiorari denied, 336 U.S. 906, 69 S.Ct. 485, 93 L.Ed. 1071.

2. For subsequent history see Nye v. United States, 4 Cir., 137 F.2d 73, certiorari denied, 320 U.S. 755, 64 S.Ct. 62, 88 L. Ed. 449.

or of" court officers "in their official transactions", is not apt wording to include a broad sweep of professional behavior of attorneys not in the presence of the court or "so near thereto as to obstruct the administration of justice." The language no doubt does apply to the official conduct of officers of the court, such, for example, as the clerk and marshal; and to referees, trustees, masters, and attorneys in special capacities. Summary power to punish them might have been thought necessary to enable a court to function with propriety and integrity. But to construe § 401(2) to include the conduct here in question is to draw into the words "official transactions" of "officers" of the court an undefined and vague area of the professional activity of an attorney. This is not the ordinary meaning of the language and we should not, in view of Nye v. United States, supra, extend its meaning beyond the ordinary. Unless the requirements of the statute are clearly satisfied, "an offense will be dealt with as the law deals with the run of illegal acts", id., 313 U.S. at page 51, 61 S.Ct. at page 817, and not by summary procedure without the protection of the Bill of Rights.

Ex parte Bradley, 7 Wall. 364, 74 U.S. 364, 19 L.Ed. 214, lends some support to the view of the majority. But the question in its present context was not there decided, and the opinion must now be read in the light of Nye v. United States, supra. See, also, the recent decision in Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11.

It must be remembered that the seriousness of the behavior, or the fact that it involved grand jurors, does not make it the behavior of a court officer in an official transaction. See Schmidt v. United States, 6 Cir., 124 F.2d 177, which, however, should be read with the earlier case of Schmidt v. United States, 6 Cir., 115 F.2d 394. The official status of the grand jurors is not in question, only the official character of appellant's own status and behavior. I think Farese v. United States, 1 Cir., 209 F.2d 312,

particularly at page 315, and the implications of In re Michael, 326 U.S. 224, 66 S.Ct. 78, 90 L.Ed. 30, also support my view that the judgment should be reversed.